## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **IMPRESA HOLDINGS ACQUISITION CORPORATION**, *et al.*, | Case No. 20-12399 (___) |
| Debtors.[1] | Joint Administration Requested |

### DECLARATION OF STEVEN F. LOYE IN SUPPORT OF FIRST DAY RELIEF

I, Steven F. Loye, hereby declare as follows:

1.     I am the Chief Executive Officer and a director of the above-captioned debtors and debtors in possession (the "Debtors"). I joined the Debtors as Chief Executive Officer in December 2016. In my time with the Debtors, I have become familiar with the Debtors' business, day-to-day operations, financial affairs, and books and records. I have over 35 years of experience in the aerospace industry and am familiar with the supply chain and typical processes and contractual requirements of the industry.

2.     On September 24, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors continue to operate their businesses and manage their affairs in the ordinary course of business as debtors in possession. The Debtors have filed several motions identified herein requesting "first day" relief. I submit this declaration in support of such first day relief, as well as to provide background on the Debtors' business and these chapter 11 cases.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Impresa Holdings Acquisition Corporation (5982); Impresa Acquisition Corporation (6088); Impresa Aerospace, LLC (1706); and Goose Creek, LLC (5777). The Debtors' mailing address is 344 W 157th St, Gardena, CA 90248.

3. Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

## I. OVERVIEW OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS

### A. The Debtors' Business

4. The Debtors are a premier supplier in the commercial and military aerospace industries. The Debtors began their existence in Southern California in 1973, under the name Venture Aircraft. In April 2012, Venture Aircraft acquired the assets of Swift-Cor Aerospace, which served the same industry for over 50 years. In connection with that acquisition, Venture Aircraft changed its name to Impresa Aerospace.

5. Since 2012, the Debtors have continuously evolved their production capacity to provide end-to-end solutions for their customers. Operating out of their facility in Gardena, California, the Debtors manufacture a wide variety of metallic products, including machined parts, fabricated components, assembled parts and tooling for the commercial aerospace and defense markets. In conjunction with producing parts, the Debtors offer a variety of manufacturing services from sheet metal fabrication, precision machining, and aluminum extrusion to more-advanced services such as hydroforming and titanium hot brake forming. The scope of the Debtors' services allows the Debtors the flexibility to support a broad range of

customers and customer applications, and tailor the parts to each customers' request, including production of parts for a Low Rate Initial Production (LRIP) or a full production volume.

6.     The Debtors service virtually all the key companies within the aerospace industry, including Boeing, Spirit AeroSystems, Collins Aerospace (a unit of Raytheon), Northrup Grumman, Cessna, Lockheed Martin, and Gulfstream.  Notable commercial programs include the Boeing 787, 777, 747 and 737, Airbus A380, and Gulfstream G550 and G650.  The Debtors' largest customer is Boeing.  Impresa maintains strong contractual positions with Boeing and provides essential product for Boeing's full range of commercial airliners.  Impresa also contracts with several other blue-chip aerospace companies including those mentioned above. The Debtors' strong contractual relationships with these key companies enabled the Debtors to profitably grow revenue from $32 million in 2016 to $43 million in 2019.

**B.     The Debtors' Ownership and Corporate Structure**

7.     The Debtors all are directly or indirectly majority owned and controlled by Twin Haven Special Opportunities Fund IV, L.P. ("Twin Haven"), a private equity fund managed by Twin Haven Capital Partners, LLC, with the remaining equity privately held by affiliates of the Debtors' former private equity owners.  Twin Haven owns 88.9% of the equity of Impresa Holdings Acquisition Corporation ("IHAC"), a Delaware corporation.  IHAC directly owns 100% of the equity of Impresa Acquisition Corporation, a Delaware corporation ("IAC"). IAC, in turn owns 100% of the equity of Impresa Aerospace, LLC ("Impresa"), a California limited liability company, and Goose Creek, LLC, a Delaware limited liability company. Impresa is the Debtors' operating entity.  Goose Creek is a defunct entity associated with a venture the Debtors ended in 2017, and has no material assets or liabilities.

8.     The following chart depicts the Debtors' organizational structure:





### D.    The Debtors' Debt Obligations

9.    As of the Petition Date, the majority of the Debtors' liabilities consists of senior secured funded indebtedness.    None of the Debtors' funded indebtedness is or was publicly offered for sale or publicly traded.    The Debtors' debt obligations comprise the following principal components:

### i.    IAC Note

10.    On October 15, 2014, IAC, as borrower, executed that certain *Secured Promissory Note*, in favor of Twin Haven, as lender, in the original principal amount of $8,000,000 (as amended, the "IAC Note").    IHAC and Impresa each entered into a certain *Guaranty*, dated October 15, 2014 (collectively, the "IAC Guaranties"), guaranteeing IAC's obligations arising under the IAC Note.  The IAC Note matures on October 15, 2020.

11.    With the IAC Note, IAC, IHAC and Impresa, as debtors, entered into that certain *Security Agreement*, dated October 15, 2014, with Twin Haven, as secured party (the

"IAC Security Agreement," and together with the IAC Note and IAC Guaranties, the "IAC Loan Documents"). The IAC Security Agreement provides a first-priority, fully-perfected security interest and lien on each of IAC's, IHAC's and Impresa's right, title, and interest in, to and under the "Collateral" as defined in the IAC Security Agreement (the "IAC Note Collateral").

12.     As of the Petition Date, the total principal outstanding under the IAC Note is not less than $13.37 million plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (the "IAC Note Obligations").

### ii.     Second Amended and Restated Impresa Note

13.     On April 29, 2016, Impresa, as maker, executed that certain Secured Promissory Note, in favor of Twin Haven, as payee, in the original principal amount of $2,000,000 (the "$2MM Note"). IHAC and IAC each entered into a Guaranty, dated April 29, 2016, guaranteeing Impresa's obligations under the $2MM Note. Along with the $2MM Note, (i) Impresa, as debtor, and Twin Haven, as secured party, entered into that certain Security Agreement, dated April 29, 2016 (the "$2MM Note Security Agreement"), that provided Twin Haven a first-priority, fully-perfected security interest and lien on all of Impresa's right, title, and interest in, to and under the "Collateral" as defined in the $2MM Note Security Agreement, and (ii) Impresa, IHAC, IAC and Twin Haven entered into that certain Conversion Agreement, dated April 29, 2016, that granted Twin Haven the right, at any time, to convert the then outstanding principal balance and accrued and unpaid interest owing under the $2MM Note into shares of common stock of IHAC.

14.     On June 30, 2016, Impresa, as maker, executed that certain Secured Promissory Note, in favor of Twin Haven, as payee, in the original principal amount of

$3,000,000 (the "$3MM Note").  IHAC and IAC each entered into a Guaranty, dated June 30, 2016, guaranteeing Impresa's obligations under the $3MM Note.  Along with the $3MM Note, (i) Impresa, as debtor, and Twin Haven, as secured party, entered into that certain Security Agreement, dated June 30, 2016 (the "$3MM Note Security Agreement"), that provided Twin Haven a first-priority, fully-perfected security interest and lien on all of Impresa's right, title, and interest in, to and under the "Collateral" as defined in the $3MM Note Security Agreement, and (ii) Impresa, IHAC, IAC and Twin Haven entered into that certain Conversion Agreement, dated June 30, 2016, that granted Twin Haven the right, at any time, to convert the then outstanding principal balance and accrued and unpaid interest owing under the $3MM Note into shares of common stock of IHAC.

15.    On December 14, 2016, Impresa executed that certain Amended, Restated and Consolidated Secured Promissory Note, in favor of Twin Haven (the "Amended and Restated Impresa Note").  The Amended and Restated Impresa Note superseded, replaced, and consolidated the $2MM Note and the $3MM Note, and included an additional loan of $623,242.00 extended from Twin Haven to Impresa.  IHAC and IAC each entered into an Amended and Restated Guaranty, dated December 14, 2016, guaranteeing Impresa's obligations under the Amended and Restated Impresa Note.  Along with the Amended and Restated Impresa Note, (i) Impresa, as debtor, and Twin Haven, as secured party, entered into that certain Amended and Restated Security Agreement, dated December 14, 2016 (the "Amended and Restated Security Agreement"), that provided Twin Haven a first-priority, fully-perfected security interest and lien on all of Impresa's right, title, and interest in, to and under the "Collateral" as defined in the Amended and Restated Security Agreement, and (ii) Impresa, IHAC, IAC and Twin Haven entered into that certain Amended and Restated Conversion

Agreement, dated December 14, 2016, that granted Twin Haven the right, at any time, to convert the then outstanding principal balance and accrued and unpaid interest owing under the Amended and Restated Impresa Note into shares of common stock of IHAC.

16.    On September 29, 2017, Impresa, as maker, executed that certain Secured Promissory Note, in favor of Twin Haven, as payee, in the original principal amount of $1,000,000 (the "$1MM Note").  IHAC and IAC each entered into a Guaranty, dated September 29, 2017, guaranteeing Impresa's obligations under the $1MM Note.  In conjunction with the $1MM Note, (i) Impresa, as debtor, and Twin Haven, as secured party, entered into that certain Security Agreement, dated September 29, 2017 (the "$1MM Note Security Agreement"), that provided Twin Haven a first-priority, fully-perfected security interest and lien on all of Impresa's right, title, and interest in, to and under the "Collateral" as defined in the $1MM Note Security Agreement, and (ii) Impresa, IHAC, IAC and Twin Haven entered into that certain Conversion Agreement, dated September 29, 2017, that granted Twin Haven the right, at any time, to convert the then outstanding principal balance and accrued and unpaid interest owing under the $1MM Note into shares of common stock of IHAC.

17.    On October 31, 2017, Impresa executed that certain Second Amended, Restated and Consolidated Secured Promissory Note, in favor of Twin Haven (as amended, the "Second Amended and Restated Impresa Note").  The Second Amended and Restated Impresa Note superseded, replaced, and consolidated the Amended and Restated Impresa Note and the $1MM Note, and included an additional loan of $124,649.00 extended from Twin Haven to Impresa.  IHAC and IAC each entered into a Second Amended and Restated Guaranty, dated October 31, 2017 (collectively, the "Impresa Guaranties"), guaranteeing Impresa's obligations under the Second Amended and Restated Impresa Note.  Along with the Second Amended and

Restated Impresa Note, Impresa, as debtor, entered into that certain *Second Amended and Restated Security Agreement*, dated October 31, 2017, with Twin Haven, as secured party (the "Impresa Security Agreement").  The Impresa Security Agreement provide a first-priority, fully-perfected security interest and lien on all of Impresa's right, title, and interest in, to and under the "Collateral" as defined in the Impresa Security Agreement (the "Impresa Note Collateral," and together with the IAC Note Collateral, the "Prepetition Collateral").  On October 31, 2017, Impresa, IHAC, IAC and Twin Haven entered into that certain *Second Amended and Restated Conversion Agreement* (the "Conversion Agreement"), that grants Twin Haven the right, at any time, to convert the then outstanding principal balance and accrued and unpaid interest owing under the Second Amended and Restated Impresa Note into shares of common stock of IHAC.

18.    As of the Petition Date, the total principal outstanding under the Second Amended and Restated Impresa Note is not less than $9.21 million plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (the "Impresa Note Obligations," and together with the IAC Note Obligations, the "Prepetition Secured Obligations").  The Second Amended and Restated Impresa Note matures on October 15, 2020.

### iii.    Trade and Miscellaneous Unsecured Debt

19.    The Debtors estimate that as of the Petition Date claims of trade and miscellaneous unsecured creditors total approximately $3.6 million.  Additionally, as described below, the Debtors have commitments to legacy vendors that may increase trade debt to approximately $10 million.

II.     **EVENTS LEADING TO FILING THE CHAPTER 11 CASES**

A.     **Grounding of the Boeing 737 MAX and the COVID-19 Pandemic**

20.     Though the Debtors believe they have a fundamentally sound business and a strong, established customer base, two significant recent events have created a "perfect storm" for the Debtors' business and necessitated filing these cases: (1) the grounding and suspension of production of the Boeing 737 MAX; and (2) the COVID-19 pandemic and its effect on the commercial aerospace industry.

21.     Boeing is the Debtors' largest customer, and the Boeing 737 MAX program is (or was) the Debtors' largest source of revenue.  Indeed, a substantial amount of the Debtors' growth in revenue from 2016 to 2019 derived from the production ramp-up of the 737 MAX program.  At that time, Boeing projected production rates of forty-two (42) 737 MAX airliners per month by late 2018 and fifty-seven (57) 737 MAX airliners per month in 2020.  For comparison purposes, production rates for the Boeing 787 Dreamliner averaged thirteen (13) units per month.  Within the aerospace industry, the 737 MAX program was highly coveted because Boeing's substantial order book for the aircraft supported high volume production of approximately 700 aircraft per year over the next 8 years, and thus provided contracted suppliers with a promising, significant source of revenue.  The Debtors hold a significant contract position with respect to the manufacturing of Boeing 737 MAX airliners and heavily invested in both capability and inventory to support the growth of 737 MAX production.  As a result, the Debtors' business, like that of many Boeing suppliers, was significantly weighted toward the 737 MAX program, and stood to benefit tremendously from the program.

22.     Tragically, however, the 737 MAX was involved in two fatal crashes in late 2018 and early 2019.  On October 29, 2018, LION Air Flight 610 crashed during take-off

from Jakarta, Indonesia, with 189 people on board, all of whom perished.  Then, on March 10, 2019, Ethiopian Airlines Flight 302 crashed during take-off from Addis Ababa airport with 157 people on board, all of whom perished.

23.     Following the second fatal crash, civil aviation authorities around the world, including the European Union Aviation Safety Agency and the Civil Aviation Administration of China, began issuing orders or directives prohibiting flights of 737 MAX aircraft over the airspace or from the airports subject to their authority.  On March 13, 2019, the Federal Aviation Authority ("FAA") followed suit, issuing an *Emergency Order of Prohibition* indefinitely grounding 737 MAX airliners.  By March 18, 2019, regulators around the world had grounded all 737 MAX aircraft that were in service with 59 airlines worldwide and making 8,600 flights per week before the grounding.

24.     Notwithstanding the grounding, with an order book of over 3,000 737 MAX airliners, in April 2019, Boeing made the initial decision to continue manufacturing the 737 MAX at close to its prior production rate (reducing the number of aircraft manufactured per month from 52 to 42), with the expectation that the aircraft would return to service within months.  Thus, near full-scale production and supplier delivery continued throughout 2019, and the Debtors, as a result, continued to ramp-up production and invest in people, equipment, and inventory.

25.     Then, on December 16, 2019, with the 737 MAX still grounded, Boeing announced a temporary halt of 737 MAX production beginning in January 2020.  At that time, the Debtors stopped all internal and external activity on the 737 MAX.  Given the Debtors' significant investments in the 737 MAX program, the indefinite grounding and production halt

challenged the Debtors' cash flow position. Although Boeing stated that production would recommence in February 2020, production did not recommence on that timeframe.

26.     In Summer 2020, the FAA and Boeing conducted the first in a series of certification test flights of the 737 MAX, and Boeing recommended its production.  However, the 737 MAX remains subject to a robust certification process before the FAA lifts the grounding order.  Moreover, Boeing's monthly production rate remains in the single figures. Boeing also is predominantly utilizing product that the company already has in inventory, rather than engaging with its suppliers to produce parts.

27.     As a result of the ongoing grounding, suspension of production, and resuming production at only a small fraction of prior levels, the Debtors continue to hold commitments for product related to the 737 MAX that they cannot sell and will not be able to sell within the lives of their current contracts.

28.     The COVID-19 pandemic has exacerbated these issues and presented additional challenges.  By March 2020, the COVID-19 pandemic was profoundly affecting the aerospace industry, including the Debtors' business, through, among other things, the imposition of stay-at-home orders and the temporary suspension of manufacturing by the Debtors' major customers, including Boeing and Spirit AeroSystems.  As a result of the pandemic, the Debtors' customers began to schedule out deliveries of parts on orders for which the Debtors have already made cash investments to procure materials and labor. With the entire industry facing challenges from COVID-19, it became increasingly difficult for the Debtors to conduct normal business operations.

29.     The effects of the 737 MAX grounding and the COVID-19 pandemic have been particularly acute because of the nature of the commercial aerospace supply chain.

Although the Debtors operate under long-term agreements with Boeing, Spirit AeroSystems and others, orders under those agreements are not necessarily guaranteed and instead are placed periodically through purchase orders.    Nonetheless, the Debtors' contracts and commercial relationships require them to anticipate and meet customers' needs.    As a result, the Debtors frequently must order or stock raw materials, supplies, and parts without corresponding firm order commitments from customers.    Many of these materials and supplies are custom made to the Debtors' (and their customers') specifications and may have no commercial application or value apart from the specific aircraft program they are ordered to support.    Additionally, due to the nature of these materials and supplies and the fact they are produced in limited quantities and custom made, they often must be purchased in large quantities (in order to justify the particular vendor's production run) and far in advance (in order to allow sufficient time for a production run) of when the Debtors receive firm orders from customers.    In ordinary circumstances, this is not an issue because order flow is generally consistent with the parties' expectations.    However, when the Debtors' customers are affected by significant events that materially reduce demand— in this case the unprecedented events of the 737 MAX grounding and COVID-19 pandemic— those customers reduce orders, leaving suppliers like the Debtors with substantial financial commitments to their own vendors but no or reduced corresponding revenue with which to meet those commitments.    This mismatch has led to the Debtors having purchased or being committed to purchase from what are now legacy vendors approximately $10 million of materials that they no longer have a need or ability to pay for during the life of their existing customer contracts.[2]

---

[2]    Apart from these legacy vendors, the Debtors otherwise are generally current with their vendor obligations.

30.     In addition to the foregoing issues, the Debtors' obligations under the IAC Note and Second Amended and Restated Impresa Note mature on October 15, 2020.  Given the Debtors' circumstances, they have no ability to repay or refinance these obligations.

**B.     The Debtors' Efforts to Avoid a Chapter 11 Filing**

31.     In the face of these unprecedent circumstances, the Debtors have undertaken concerted efforts to shore up their liquidity and avoid the need to file these chapter 11 cases.  Among other things, the Debtors have negotiated with their customers in an effort to extend existing contracts so that they would have use for (and revenue from) the now-legacy inventory purchases described above.  The Debtors also engaged with the relevant vendors in an effort to compromise and reduce these now-legacy obligations.  Unfortunately, these efforts have not been successful.

32.     Additionally, in response to the suspension of 737 MAX production, the Debtors took steps to reduce their employees' overtime from an approximately 20%-plus level to almost zero.  In January 2020, the Debtors also conducted a reduction in force of 14 people or approximately 7% of the workforce.  As Boeing continued to extend the production halt, in March 2020, the Debtors conducted a second reduction in force of 25 people or approximately 13% of the workforce.  At the same time, the Debtors began managing the claims from contracted suppliers associated with the 737 MAX production for payment on products that the Debtors had no use for while Boeing's production remained suspended.  The Debtors effectively ceased further in-flow of product and set to work managing the outstanding payments for product that suppliers had already delivered.

33.     Additionally, in early April 2020, the Debtors applied for and received a Paycheck Protection Program loan under the CARES Act in the amount of $2.1 million (the

"PPP Loan").  The Debtors used the PPP Loan proceeds for permitted purposes,[3] including paying employees' wages and other workforce obligations through July 2020 with the hope that by then the pandemic restrictions would be lifted, and 737 MAX production would be ramping back up to its prior production rates.  When neither of these hopes came to fruition, the Debtors conducted another reduction in force of 18 people or approximately 11% of the Debtors' workforce.  At the same time, the Debtors also commenced a workshare program through the State of California Employment Development Department ("EDD"), which allowed the Debtors to reduce their operations to a four-day work week.  This workshare program allows the Debtors' employees to file partial unemployment claims for compensation with the EDD for the fifth workday.  The Debtors' efforts stabilized the company's cash flow but significant legacy obligations to suppliers related to the 737 MAX program remain, and the Debtors cannot meet these obligations or their maturing debt obligations due on October 15, 2020.

34.    As it became apparent that the Debtors' ongoing efforts at addressing their circumstances may not be sufficient, in August 2020, the Debtors retained Morris, Nichols, Arsht and Tunnell LLP, as restructuring counsel, and Duff & Phelps Securities, LLC, as the Debtors' investment banker to assist in pursuing strategic alternatives, including a potential chapter 11 filing.  Additionally, the Debtors' board of directors in August 2020 appointed an independent restructuring committee comprising two independent directors—one aerospace industry expert and one restructuring advisor—and delegated to the independent restructuring committee all matters involving Twin Haven, the Debtors' equity sponsor and secured lender.

---

[3]    The Debtors have applied for forgiveness of the PPP Loan.

### III.    THE DEBTORS COMMENCE THESE CHAPTER 11 CASES TO PURSUE A VALUE-MAXIMIZING SALE

35.    After considering alternatives, the Debtors have determined that pursuing a going concern section 363 sale in chapter 11 represents the best path forward to preserve and maximize value for the benefit of their stakeholders.  To that end, the Debtors and the Debtors' investment banker, Duff & Phelps, have prepared a teaser and confidential information memorandum, and will be immediately launching a fulsome postpetition marketing process.  The Debtors have concurrently filed a motion seeking the approval of sale and bid procedures to facilitate the Debtors' sale efforts (the "Bid Procedures Motion").

36.    Additionally, through arm's-length negotiations conducted by their independent restructuring committee and advisors, the Debtors have negotiated with Twin Haven to serve as stalking horse bidder with a credit bid of $10 million.  Importantly, the terms of Twin Haven's stalking horse bid do not require the Debtors to pay any break-up fee, expense reimbursement, or other forms of bid protections.  The Debtors believe that this important concession from Twin Haven will help foster increased interest in the Debtors' business and aid the Debtors in maximizing value.

37.    In addition to securing a favorable stalking horse bid, the Debtors also have secured funding for these cases through the consensual use of Twin Haven's cash collateral, the terms of which were negotiated at arm's length by the independent restructuring committee and the Debtors' advisors opposite Twin Haven and its advisors.  The Debtors believe that access to cash collateral pursuant to an agreed upon budget is sufficient to fund these cases through a sale process.

38.    Pursuant to the Bid Procedures Motion and the Cash Collateral Order (defined below), the Debtors anticipate closing a going concern sale by December 18, 2020.

15

## IV.    FIRST DAY MOTIONS

39.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of motions identified herein requesting "first day" relief (the "First Day Motions"). The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases. I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtors' personnel and advisors.

### A.    Joint Administration Motion

40.    The Debtors seek the entry of an order directing joint administration of their chapter 11 cases for procedural purposes, as well as related relief (the "Joint Administration Motion"). The Debtors also request that (a) the Court maintain one file and one docket for the jointly-administered chapter 11 cases under the case number assigned to Impresa Holdings Acquisition Corporation, and (b) these chapter 11 cases be administered under a consolidated caption as described in the Joint Administration Motion.

41.    The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, as all of the Debtors are wholly owned direct or indirect subsidiaries of Impresa Holdings Acquisition Corporation. Many of the motions, hearings, and orders in these chapter 11 cases will affect all of the Debtors.

42.    Entry of an order directing joint administration of the Debtors' chapter 11 cases will avoid duplicative notices, applications and orders, thereby saving the Debtors and parties in interest considerable time and expense, as well as ease the administrative burden on the

Court and the parties.  The rights of creditors will not be adversely affected because the Joint

Administration Motion requests only administrative consolidation of the chapter 11 cases.  By

aggregating all papers related to the Debtors under the same case caption and docket, creditors

and parties in interest will be able to access and review relevant information concerning the

Debtors in one place, and will thereby be better able to keep apprised of the matters before this

Court.

43.    Accordingly, I believe that joint administration of the Debtors' estates is in

the best interests of the Debtors, their estates and creditors, and parties in interest.

### B.    Motion to Appoint Claims and Noticing Agent

44.    The Debtors request entry of an order authorizing the retention and

appointment of Stretto ("Stretto")[4] as claims and noticing agent in connection with the chapter 11

cases, effective *nunc pro tunc* to the Petition Date (the "Stretto Retention Application").  The

Stretto Retention Application pertains only to the work to be performed by Stretto under the

Clerk of the Court's delegation of duties permitted by section 156(c) of the Judicial Code, Local

Rule 2002-1(f) and the Claims Agent Protocol.  Among other things, Stretto will: (i) prepare and

serve required notices in these chapter 11 cases; (ii) maintain a list of all potential creditors,

equity holders and other parties in interest, and a core mailing list; and (iii) maintain an official

claims register for each Debtor, if necessary, and process all proofs of claim received, if any.

45.    I believe that the relief requested in the Stretto Retention Application is in

the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will

ease the administrative burden on the Clerk in connection with these chapter 11 cases.  In

addition, I have been advised by counsel that the retention of a claims and noticing agent is

---

[4]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

required by the Local Rules in light of the anticipated number of creditors in these chapter 11 cases. Having solicited proposals from three claims and noticing agents, Stretto provided what the Debtors deemed to be the most cost-efficient terms for the services to be provided. Accordingly, on behalf of the Debtors, I respectfully submit that the Debtors' application to retain Stretto should be approved.

### C. Wages Motion

46.     The Debtors have filed a motion (the "<u>Wages Motion</u>") seeking entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay all amounts required under or related to the Compensation Obligations, Payroll Maintenance Fees, Withholding Obligations, Reimbursable Expenses, and Credit Card Obligations (each as defined below and, together with any associated administrative costs, the "<u>Workforce Obligations</u>"); (ii) authorizing, but not directing, the Debtors to maintain their employee compensation practices, programs, benefits, and policies (collectively, the "<u>Compensation and Benefits Programs</u>"), as were in effect on the Petition Date; and (iii) granting related relief.

47.     As of the Petition Date, the Debtors employ approximately 149 people (collectively, the "<u>Employees</u>"), all of whom are located in the United States.[5]  All Employees are employed on a full-time basis, however, as indicated above, Debtors recently reduced their operations to a four-day work week.  Employees may file partial unemployment claims for

---

[5]     As described above, in the months leading up to the Petition Date, the Debtors reduced their work force by approximately 50 employees.  The Debtors believe that they have paid final wages and paid time off, if any, due to the employees affected by the reduction in force.  To the extent, however, that additional amounts are owed to such former employees, the Debtors request authority in the Wages Motion to honor such amounts in the ordinary course of business up to the statutory cap of $13,650 provided in section 507(a)(4) of the Bankruptcy Code, and request that the banks and financial institutions are directed to honor and pay such checks so long as such checks were issued on account of wages or salary earned within 180 days of the Petition Date, and, to the extent such checks are canceled or dishonored as a result of filing the chapter 11 cases, the Debtors request that they be granted authority to reissue checks as appropriate.

compensation for the fifth day with the State of California Employment Development Department.  Approximately 120 Employees are paid on an hourly basis and approximately 29 Employees are paid a salary.  None of the Employees are unionized or party to collective bargaining agreements or similar labor arrangements.

48.     The Debtors also use the personal services of individuals who are not Employees but are engaged directly by the Debtors as independent contractors, consultants, or other similar roles (collectively, the "Contingent Workers," and together with the Employees, the "Workforce").  The Contingent Workers include, but are not limited to, engineers, financial support staff, information technology support staff, and programmers that the Debtors employ on an as-needed basis and, depending on business needs, may vary in number from time to time.  The Debtors may utilize the services of staffing or employment agencies to identify such Contingent Workers.  The Contingent Workers comprised two individuals as of the Petition Date.

49.     The Workforce performs a wide variety of critical functions, including quality control, vendor and customer negotiations, information technology, administrative, compliance, finance, and management-related tasks.  Moreover, the Workforce possesses the institutional knowledge, experience, and skills necessary to support the Debtors' business operations during these Chapter 11 Cases and to support a successful sale of the Debtors' business as a going concern.  Failing to honor any Workforce Obligations or Compensation and Benefit Program is likely to result in attrition, leading to severe adverse impacts to the Debtors' operations at a critical time in the chapter 11 cases.  The Workforce will also face significant financial consequences if the Debtors are not permitted to continue to satisfy the Workforce

Obligations and administer the Compensation and Benefits Programs in the ordinary course of business.

### i.    **Workforce Obligations**

#### Compensation Obligations

50.    In the ordinary course of business, the Debtors pay all Employees on a bi-weekly basis, with payroll being disbursed the Friday following the end of a two-week payroll period.[6]  The Debtors will next disburse payroll on October 2, 2020, for the payroll period of September 14, 2020, through September 25, 2020.  Accordingly, the Debtors owe Employees accrued but unpaid Compensation Obligations as of the Petition Date.  Compensation Obligations also may be due as of the Petition Date for a variety of reasons, such as Employees holding issued but uncashed paychecks.  In the 12-month period before the Petition Date, the Debtors' Compensation Obligations totaled approximately $750,000–$800,000 per month.[7]

51.    The Debtors estimate that they owe approximately $245,000 on account of Compensation Obligations earned by Employees before the Petition Date, all of which will become due and payable within 21 days of the Petition Date (the "Interim Period").  The Debtors seek authority, but not direction, to satisfy the prepetition Compensation Obligations in the ordinary course of business, including reissuing any uncashed paychecks as necessary, and to honor Compensation Obligations after the Petition Date in the ordinary course.

---

[6]    In addition to employee payroll, the Debtors pay independent director fees to the two independent directors that sit on the boards for IHAC and IAC (together with employee payroll, the "Compensation Obligations").  As of the Petition Date, the Debtors believe they are current on all payments owed to the independent directors.

[7]    During the 12-month period before the Petition Date, the Debtors reduced their work force by approximately 50 Employees.  Accordingly, this amount does not accurately reflect the Debtors' current monthly Compensation Obligations.

### Contingent Worker Obligations

52.    The Debtors pay obligations owed to the Contingent Workers directly, or indirectly through staffing or employment agencies, subject to the terms of the Contingent Workers' individual contracts or arrangements with the Debtors (the "Contingent Worker Obligations").  The Debtors do not pay wages to, withhold taxes for or provide benefits or paid time off to the Contingent Workers.  In the 12-month period before the Petition Date, the Debtors paid an average of approximately $2,000 per month on account of Contingent Worker Obligations, directly or indirectly, to the Contingent Workers.

53.    Due to the individualized and *ad hoc* nature of the Contingent Workers' working relationship with the Debtors, it is difficult for the Debtors to determine total accrued and unpaid prepetition Contingent Worker Obligations as of the Petition Date with specificity.  However, the Debtors believe that they owe approximately $2,000 on account of Contingent Worker Obligations as of the Petition Date, all of which will become due and payable within the Interim Period.

### Payroll Maintenance Fees

54.    To efficiently manage the processing and payment of the various obligations described herein, the Debtors rely on a third party firm—ADP—to handle administrative functions including, but not limited to, payroll processing, withholding, remittance, and reporting of payroll taxes for the Employees (the "Payroll Administrator").  The Debtors pay the Payroll Administrator on a bi-weekly basis, with annual fees totaling approximately $140,000–$150,000 (the "Payroll Maintenance Fees").  As of the Petition Date, the Debtors estimate that they owe approximately $6,000 in Payroll Maintenance Fees to the Payroll Administrator, all of which will become due and payable during the Interim Period.

<u>Withholding Obligations</u>

55.     The Debtors are required by law to withhold salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (the "<u>Withholding Taxes</u>").    The Debtors are obligated to remit such Withholding Taxes to the appropriate taxing authorities (collectively, the "<u>Taxing Authorities</u>"). The Debtors also are required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "<u>Employer Payroll Taxes</u>" and, together with the Withholding Taxes, the "<u>Payroll Tax Obligations</u>").    In the aggregate, the Debtors' monthly Payroll Tax Obligations total approximately $180,000.    As of the Petition Date, the Debtors estimate that they owe approximately $50,000 on account of Payroll Tax Obligations relating to the prepetition period, all of which will become due and payable during the Interim Period.

56.     In the ordinary course of processing payroll for the Employees, the Debtors also may (a) be required by law, in certain circumstances, to withhold from certain Employees' wages and salaries amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments, as well as (b) make other routine deductions for 401(k) contributions and employee 401(k) loan repayments, as well as other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (collectively, the "<u>Deductions</u>" and, together with the Payroll Tax Obligations, the "<u>Withholding Obligations</u>").    Each pay cycle, the Debtors withhold Deductions from applicable Employees' paychecks and remit them to the appropriate authorities or entities.    On average, the Debtors

22

withhold approximately $50,000 in Deductions per month from Employees' wages and salaries. As of the Petition Date, the Debtors estimate that they currently have withheld approximately $30,000 on account of Deductions.

57.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Withholding Obligations is approximately $80,000, excluding pre- and after-tax deductions payable pursuant to the employee benefit plans discussed herein, which are accounted for in the Health Insurance Obligations (defined below).  The Debtors seek authority to continue remitting and paying the Withholding Obligations (whether pre- and postpetition) to the appropriate authorities and entities in the ordinary course of business and to pay any administrative fees with respect to the Withholding Obligations.

<u>Reimbursable Expenses and Credit Card Obligations</u>

58.    In the ordinary course of business, the Debtors reimburse their Employees for reasonable and customary expenses incurred in the scope of their employment (collectively, the "<u>Reimbursable Expenses</u>").  The Reimbursable Expenses include, among others, travel, lodging, transportation, meals and other miscellaneous expenses.  In the 12-month period before the Petition Date, the Debtors reimbursed, on average, approximately $5,000 in Reimbursable Expenses each month.  As of the Petition Date, the Debtors do not believe they have any accrued and outstanding Reimbursable Expenses; however, out of an abundance of caution, the Debtors request authority to pay Reimbursable Expenses in the ordinary course of business whether accrued pre- or postpetition.

59.    In addition, the Debtors maintain Mastercard credit cards issued by Fifth Third Bank (the "<u>Corporate Credit Cards</u>") that are used in connection with the Employees' day-

to-day job functions.[8]  Employees may use the Corporate Credit Cards to pay for job-related expenses, including, fuel and tool purchases.  All Corporate Credit Cards issued by the Debtors to their Employees have detailed restrictions on permissible expenditures, and Employees are responsible for any non-reimbursable amounts charged to the Corporate Credit Cards.  The obligations arising under the Corporate Credit Cards are paid directly by the Debtors.  The Debtors estimate that they incur obligations under the Corporate Credit Cards of approximately $20,000 per month (the "Corporate Credit Card Obligations").  As of the Petition Date, the Debtors estimate that they owe no more than $10,000 in outstanding Corporate Credit Card Obligations, all of which will become due in the Interim Period.

60.    The Debtors seek authority to satisfy all prepetition obligations related to Reimbursable Expenses and Corporate Credit Card Obligations, as and when they arise, and to continue to use the Corporate Credit Cards in the ordinary course of business.

### ii.    Compensation and Benefits Programs

61.    In the ordinary course of business, the Debtors maintain various employee compensation and benefits plans, policies, and programs (collectively, the "Compensation and Benefits Programs" and, all amounts required under or relating thereto, the "Benefits Obligations").  The Compensation and Benefits Programs generally fall into the following categories (a) paid time off, including vacation and other leave; (b) medical, prescription drug, dental, and vision benefits; (c) 401(k) plan benefits; (d) workers' compensation program; and (e) certain other miscellaneous benefits programs, such as short-term and long-term disability

---

[8]    The Debtors have historically maintained, in the ordinary course of business, Mastercard credit cards issued by Fifth Third Bank for Employee expenses and American Express credit cards to pay vendor expenses (the "Vendor Payments").  As of the Petition Date, the Debtors intend to discontinue the American Express credit cards and pay the Vendor Payments by other means, including payment by check or through the Mastercard credit cards.

programs, life insurance, supplemental life insurance, an employee assistance program, holidays and bereavement. While many Employees participate in the Compensation and Benefits Programs, certain Employees may elect to opt-out of a particular program or programs.

62. The Debtors request authority to maintain the Compensation and Benefits Programs in the ordinary course of business and pay all Benefits Obligations, whether related to the period before or after the Petition Date. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Benefits Obligations, including administrative fees, is approximately $130,000, all of which will become due and payable during the Interim Period.

<u>Paid Time Off</u>

63. In the ordinary course of business, the Debtors provide eligible Employees with paid vacation time ("<u>PTO</u>"). Pursuant to the Debtors' PTO policies, Employees earn vacation days based on length of service, and over the course of a calendar year. Unused PTO may be carried over into the next year up to the maximum accrual amount, which depends on tenure and other factors. The highest maximum accrual amount is 240 hours or 6 weeks and the lowest maximum accrual rate is 60 hours or 1.5 weeks.

64. An Employee who reaches their maximum accrual amount will cease accruing PTO until their available balance drops below the maximum allowable amount. Employees are paid out accrued PTO upon termination regardless of length of service or reason for termination. The Debtors estimate that, as of the Petition Date, the Employees have approximately $400,000 in accrued PTO obligations. This accrued amount, however, does not represent a true, present cash liability for the Debtors, as the Debtors anticipate that most Employees will use most of their PTO in the ordinary course of business, and will only receive cash payments on account of unused PTO upon termination or resignation, if at all.

65.     PTO is an essential feature of the employment package provided to the Employees, and failing provide this benefit would harm Employee morale and encourage the premature departure of valuable Employees.  Moreover, pursuant to California law, the Debtors are required to pay PTO at termination.  Accordingly, pursuant to the Wages Motion, the Debtors request authority to (i) honor their PTO policy in the ordinary course of business and consistent with past practices, whether accrued pre- or postpetition, and (ii) subject to entry of the Final Order, pay the value of accrued PTO to any Employees terminated on or after the Petition Date, including in excess of the cap imposed by section 507(a)(4) of the Bankruptcy Code, as required under applicable state law.

Health Insurance Programs

66.     The Debtors provide Employees with access to medical, dental and vision coverage through Aetna, as well as flexible spending accounts through Discovery Benefits (collectively, the "Health Insurance Programs" and all amounts required under or relating thereto, the "Health Insurance Obligations").  On average, the Debtors expend approximately $115,000 in the aggregate per month in connection with Health Insurance Obligations.  As of the Petition Date, the Debtors estimate that accrued but unpaid Health Insurance Obligations, including administrative fees, total approximately $115,000, all of which will become due and payable during the Interim Period.  The Debtors seek authority, but not direction, to honor all Health Insurance Obligations that arose prepetition, and honor any amounts that become due in the ordinary course.

401(k) Plan

67.     The Debtors maintain a qualified defined contribution savings plan for the benefit of their current and retired Employees (the "401(k) Plan"), which is designed to meet the

26

requirements of sections 401(a) and 401(k) of title 26 of the United States Code.  The 401(k) Plan is administered by Actuarial Benefits Corp.  Approximately 124 active Employees are enrolled in the 401(k) Plan.  Employees who are enrolled in the 401(k) Plan contribute approximately $29,000 per month in the aggregate to the 401(k) Plan, which contributions are withheld by the Debtors from Employees' compensation.  The Debtors may match Employee contributions based on each individual Employees' compensation for a given year (the "401(k) Matching Obligations").  In the 12-month period before the Petition Date, the Debtors paid approximately $84,000 on account of 401(k) Matching Obligations.  The Debtors estimate that they pay approximately $7,000 each month on account of 401(k) Matching Obligations.  In addition, the Debtors also periodically withhold, at the Employee's direction, certain amounts from employee paychecks to repay loans that the Employee has taken from his or her 401(k) investments (the "401(k) Loan Deductions").  As of the Petition Date, the Debtors estimate that they owe approximately $7,000 on account of 401(k) Matching Obligations and 401(k) Loan Deductions relating to the prepetition period, all of which will become due and payable during the Interim Period.

Workers' Compensation Program

68.    The Debtors maintain workers' compensation insurance as required by applicable state laws (the "Workers' Compensation Program"), specifically a fully-insured workers' compensation policy with Insurance Company of the West (the "Workers' Compensation Insurer") that covers workers' compensation claims.  The Debtors pay an annual premium in connection with the Workers' Compensation Program of approximately $350,000 based upon a fixed rate established and billed by the Workers' Compensation Insurer (the "Workers' Compensation Insurance Premium").  As of the Petition Date, the Debtors are current

on their Workers' Compensation Insurance Premium.  However, out of an abundance of auction, the Debtors request authority to maintain the Workers' Compensation Program in the ordinary course of business, and to pay any obligations arising under or in connection with the Workers' Compensation Program, including the Workers' Compensation Insurance Premium, as they come due.

Miscellaneous Benefits

69.    The Debtors also offer several other miscellaneous benefits to certain eligible Employees.  These miscellaneous benefits include, but are not limited to, short-term and long-term disability programs, life insurance, supplemental life insurance, an employee assistance program, holidays and bereavement.  The Debtors believe that honoring these miscellaneous benefits will help boost Employee morale and confidence in Debtors and maintain the current workforce.  The obligations owed to the Employees with respect to these miscellaneous benefits are *de minimis*, and the Debtors request authority to continue to honor these miscellaneous benefits in the ordinary course.

70.    For the foregoing reason, I believe granting the Wages Motion is in the best interest of the Debtors, their estates and creditors and parties in interest.

**D.    Insurance Motion**

71.    The Debtors have filed a motion (the "Insurance Motion") seeking entry of an order authorizing but not directing the Debtors to (i) maintain existing Insurance Policies (as defined below) and to pay on an uninterrupted basis all premiums, Brokerage Fees (as defined below), deductibles and administration fees (collectively, the "Insurance Obligations") arising thereunder or in connection therewith, including any Insurance Obligations for prepetition periods; (ii) renew, revise, extend, supplement, change or enter into new insurance

policies as needed in their business judgment without further order of the Court; and (iii) continue to honor their Premium Financing Obligations (as defined below).

72.    The Debtors also request that the Court: (a) authorize and direct any and all banks with which the Debtors maintain accounts that the Debtors use to make payments related to the Insurance Policies, Insurance Obligations and the Premium Financing Obligations to receive, process, honor and pay all checks drawn on such accounts and fund transfers for payments with respect to the Insurance Policies, Insurance Obligations and the Premium Financing Obligations whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments; and (b) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Insurance Policies, Insurance Obligations and the Premium Financing Obligations and to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

<u>Insurance Policies</u>

73.    In the ordinary course of their business operations, the Debtors maintain insurance policies providing coverage for general liability, aircraft products liability, difference in conditions, executive risk,[9] foreign package, workers' compensation liability, automobile liability, umbrella and excess liability, property liability, inland marine liability, pollution liability, and cyber liability (collectively, the "<u>Insurance Policies</u>").  For the policy period of 2019 to 2020 the total annual premiums under the Insurance Policies are approximately $588,000.  The Insurance Policies, which the Debtors have obtained through third-party

---

[9]    The Debtors' executive risk policy (the "<u>Executive Risk Policy</u>") includes coverage for director and officer liability, employment practices liability, fiduciary liability, crime coverage and kidnap, ransom and extortion coverage.

insurance carriers (collectively, the "Insurance Carriers"), are listed on Exhibit C attached to the Insurance Motion.  In connection with the Insurance Policies, the Debtors make payments to certain Insurance Obligations, including premiums, deductibles and administration fees. As of the Petition Date, the Debtors do not believe they have any accrued and outstanding Insurance Obligations.

74.    The Debtors' current Insurance Policies expire on October 28, 2020, and, as such, the Debtors intend to renew or replace their Insurance Policies in the ordinary course. With respect to the Executive Risk Policy, the Debtors plan to purchase "tail coverage" during the renewal process.

75.    The Insurance Policies are essential to preserving the value of the Debtors' business, property and assets.  Much of the coverage provided by the Insurance Policies is required by regulations, laws and contracts that govern the Debtors' commercial activities. Furthermore, section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal.

Premium Financing Obligations

76.    A majority of the annual premiums due under the Insurance Policies were financed through First Insurance Funding pursuant to the Commercial Premium Finance Agreement (the "PFA") attached to the Insurance Motion as Exhibit D.  In accordance with the PFA, the Debtors made a cash down payment of $30,204.76, in addition to ten (10) monthly payments of $9,656.65, with the first payment being due on November 28, 2019, and the final payment being having been made on August 28, 2020 (collectively, the "Premium Finance Obligations"), on account of policy premiums and finance charges.  Accordingly, as of the

Petition Date, the Debtors believe they have satisfied all of their Premium Financing Obligations through October 28, 2020, the end of their current policy period.

77.     However, out of an abundance of caution, the Debtors request authority to pay any Premium Financing Obligations that may subsequently be determined to be owed either for the pre- or postpetition period, as the Debtors' failure to pay such obligations could result in the termination of the Insurance Policies that are financed through the PFA, which in turn would cause significant disruption and distraction to the Debtors' estates.  The Debtors further seek authority to renew or enter into new premium financing arrangements, including with respect to any Insurance Policies that relate to D&O Liability, the purchase of "tail coverage."

Brokerage Fees

78.     Sullivan Curtis Monroe Insurance Service ("Sullivan Curtis") serves as the Debtors' insurance broker.  Sullivan Curtis aids the Debtors in negotiations with the Debtors' insurers and assists the Debtors in pricing and obtaining the insurance coverage necessary to operate their business in a responsible and prudent manner and in accordance with applicable legal requirements, while optimizing pricing and savings in procuring the policies.  The Debtors believe that it is in the best interests of their creditors and estates to continue their relationship with Sullivan Curtis.

79.     The Debtors pay brokerage fees to Sullivan Curtis (the "Brokerage Fees") upon the signing or renewal of certain policies.  The Brokerage Fees are bundled into the premium costs for each insurance policy the Debtors maintain, and generally are not paid or identified separately.  The Debtors believe they are current on all Brokerage Fees as of the Petition Date.  Out of an abundance of caution, the Debtors request authority to pay, in their discretion, any Brokerage Fees or other amounts owing to Sullivan Curtis that may subsequently

be determined to be owed for periods prior to the Petition Date, as the Debtors' failure to pay such amounts could result in a loss of Sullivan Curtis's assistance in maintaining the Debtors' beneficial business relationships with their insurance carriers.

80.     For the foregoing reasons, I believe granting the Insurance Motion is in the best interest of the Debtors, their estates and creditors and parties in interest.

**E.     Taxes Motion**

81.     The Debtors have filed a motion (the "Taxes Motion") seeking entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay certain prepetition taxes, assessments, fees, and other charges in the ordinary course of business (the "Taxes and Fees") in an aggregate amount not to exceed $80,000 on an interim basis and final basis; (ii) authorizing, but not directing, all banks and other financial institutions to honor, to the extent of available funds, all checks and other fund transfers authorized pursuant to this Motion, whether such checks or other fund transfers are issued or presented prior to, on or after the Petition Date; and (iii) granting related relief.

82.     In the ordinary course of business, the Debtors collect, withhold, and incur an assortment of Taxes and Fees that they remit periodically to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "Taxing Authorities").  The Taxes and Fees include (a) Sales and Use Taxes, (b) Corporate Income Taxes, (c) Property Taxes, and (d) Fees and Licenses (each as defined and described below).

83.     The Debtors believe that they are current on all Taxes and Fees that were due and owing prior to the Petition Date.  To the extent, however, that the Debtors have inadvertently failed to timely pay any Taxes and Fees which became due and owing prior to the

Petition Date, the Debtors are not, by this Motion, seeking authority to remit any "catch-up" payments, late penalties or similar fees to any of the Taxing Authorities.

84.     The Debtors estimate that as of the Petition Date, they have accrued approximately $80,000 of Taxes and Fees, all of which will become due and payable in the ordinary course of business during the Interim Period.[10]

### Sales and Use Taxes

85.     The Debtors incur various sales and use taxes in the ordinary course of business (collectively, the "Sales and Use Taxes").  Specifically, the Debtors collect and remit sales and use taxes to certain Taxing Authorities in connection with the operation of their businesses and the sale and distribution of their services and products.  In addition, the Debtors incur use taxes on account of the purchase of various materials and services from vendors who are not registered to collect sales taxes for the state where the property is delivered or the services are provided, or who otherwise fail to collect such taxes.  The Debtors estimate that, as of the Petition Date, they will not have any accrued but unpaid Sales and Use Taxes.

### Corporate Income Taxes

86.     Certain federal, state and local Authorities where the Debtors operate require that the Debtors pay income or corporate taxes, including gross receipts taxes (the "Corporate Income Taxes").  Corporate Income Taxes are generally calculated as a percentage of net income, although in certain jurisdictions Corporate Income Taxes are calculated as a percentage of gross receipts.

87.     The Debtors generally remit Corporate Income Taxes to the Authorities on a quarterly basis.  The Debtors estimate that, as of the Petition Date, they have accrued no more

---

[10]     This estimate does not include any potential prepetition liabilities related to the Taxes and Fees that may later come due as the result of any audit.

than $20,000 in unpaid Corporate Income Taxes, all of which will become due and payable during the Interim Period.

Property Taxes

88.    The Debtors are subject to property taxes levied by state and local governments (the "Property Taxes").  The Debtors typically pay Property Taxes in the ordinary course, and such taxes are typically invoiced in arrears and for the prior quarter or year depending on how the relevant Property Tax is assessed.  Paying Property Taxes is critical because failing to pay certain Property Taxes may give rise to liens on the Debtors' property in favor of the relevant Taxing Authority to secure payment of those taxes.  Not paying Property Taxes could also result in additional fees and penalties being assessed against the Debtors.

89.    The Debtors estimate that as of the Petition Date, they have accrued approximately $50,000 in Property Taxes, all of which will become due and payable during the Interim Period.

Fees and Licenses

90.    In the ordinary course of business, the Debtors are required to pay a variety of regulatory and business license fees that are critical to maintaining the ongoing operations of the Debtors' business, including sanitation fees, permit fees paid to the County of Los Angeles Department of Public Works, and corporate fees paid to the applicable Secretaries of State (collectively, the "Fees and Licenses").  The methods for calculating the Fees and Licenses, and the deadlines for paying such amounts, vary significantly based on the issuing Authority and the nature of the license or permit.  The Debtors estimate that, as of the Petition Date, they have accrued no more than $10,000 in unpaid Fees and Licenses on account of the

prepetition period (in whole or in part), all of which will become due and payable during the Interim Period.

91.    For the foregoing reasons, I believe granting the Taxes Motion is in the best interest of the Debtors, their estates and creditors and parties in interest.

### F.    Critical Vendor Motion

92.    The Debtors have filed a motion (the "Critical Vendor Motion") seeking entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay prepetition claims of certain vendors that are critical to the Debtors' ongoing business operations (the "Critical Vendors") in an amount not to exceed $450,000 on an interim basis and final basis (the "Critical Vendors Claims Cap"); and (ii) granting related relief.

93.    As is the norm throughout the aerospace industry, the Debtors' business functions under a tiered supply chain structure whereby the Debtors manufacture and service specialized aerospace components that are in turn utilized and incorporated by customers into their platforms and airplanes and helicopters.  In addition, the Debtors operate in a highly-regulated business environment and are required to maintain or service components at standards necessary to meet safety and other regulations.  The aerospace manufacturing and servicing industries necessarily have customer bases that demand highly specific and customized parts and services.  The Debtors' focus on implementing the latest manufacturing systems and maintaining their extensive supplier network affords the Debtors the ability to respond quickly and effectively to address their customers' manufacturing and servicing demands.  This responsiveness requires uninterrupted goods and services from the Debtors' Critical Vendors. Uninterrupted supply of these goods and services is essential to the Debtors' continued operations, and the Debtors would be highly disadvantaged in the competitive aerospace industry

without access to the goods and services provided by Critical Vendors.  The Debtors must be able to assure their customers, employees and vendors that the business will continue to operate at a successful and sustainable level.

Criteria for Selecting Critical Vendors

94.     To identify vendors that are essential to the Debtors' business, the Debtors carefully reviewed their vendor and service providers to determine which could satisfy the criteria of being deemed critical to the Debtors' continued operations.  Among other things, the Debtors reviewed their accounts payable and prepetition vendor list to identify any and all creditors who are critical based upon the necessity of the goods or services supplied by the vendor, the likelihood that the vendor would cease to do business with the Debtors or otherwise materially disrupt the Debtors' businesses absent payment, and the ease or possibility of replacing the vendor if necessary.

95.     The Debtors are confident that this process appropriately identified only those vendors that, if the Debtors failed to pay for the vital goods and services it provided prepetition, would likely cease providing necessary goods and services in the future or would impose unworkable terms or conditions, and for which alternatives were are not available or practicable.

96.     The Critical Vendors are essential to the Debtors' manufacturing operations such that any disruption in the supply of their respective goods or services, even for a short duration, would jeopardize the Debtors' ability to satisfy customer demands and generate revenue.  Moreover, many of the Critical Vendors offer highly specialized or regulated goods and services customary to the aerospace industry and more specifically the Debtors, and thus cannot be readily replaced.  Accordingly, the Debtors believe it is necessary to maintain positive

business relationships with the Critical Vendors.  To assure these business relationships, the Debtors seek the authority to pay, in their sole discretion and business judgment, all or a portion of the prepetition claims owed to the Critical Vendors (the "Critical Vendor Claims") not to exceed the Critical Vendor Claims Cap.

97.     The Critical Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue an uninterrupted supply of critical goods and services.  The Debtors may pay less than the requested amount.  The Debtors further request that the Court grant the Debtors the authority to allocate the forgoing amounts at the Debtors' discretion without prejudice to seeking additional relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

Proposed Terms and Conditions of Payment of the Critical Vendor Claims

98.     To preserve liquidity during the chapter 11 cases and ensure that the Debtors continue to receive vital goods and services, the Debtors propose to condition payment on account of Critical Vendor Claims on such Critical Vendor's agreement that it will continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one hundred eighty (180) days of the Petition Date (the "Customary Trade Terms").  The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to paying any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as

defined herein), to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

99.    The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors may send a letter, in the form, or substantially similar to that, attached to the Critical Vendor Motion as Exhibit C, to the Critical Vendors to which it is making such payment, along with a copy of the order (the "Order") granting the Critical Vendor Motion, including, without limitation the terms described in the Critical Vendor Motion.

100.    Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").  The Debtors seek authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.

101.    In addition to the Trade Agreement described above, the Debtors seek authority to agree on Customary Trade Terms with Critical Vendors by less formal means, including email correspondence.  While the Critical Vendors provide crucial goods and services to the Debtors' business, many of these Critical Vendors are small businesses and the amounts owed to many vendors are relatively small.  These Critical Vendors may find the process of entering into a formal Trade Agreement overly burdensome, which for some may require hiring outside counsel to review the Trade Agreement.  To avoid the risk of Critical Vendors refusing to provide their goods and services and potential interruptions to the supply of vital goods and services, the Debtors request authority, in their sole discretion, to negotiate and agree on

Customary Trade Terms with certain Critical Vendors absent a Trade Agreement as the Debtors deem appropriate.

102.   If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors seek authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (i) to declare such Trade Agreement immediately terminated (if applicable) and (ii) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

103.   In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation.   In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment of its Critical Vendor Claim.

### G.   Cash Management Motion

104.   The Debtors have filed a motion (the "Cash Management Motion") seeking entry of interim and final orders: (i) authorizing, but not directing, the Debtors to (a) continue their existing cash management system, (b) honor certain prepetition obligations related

thereto, (c) maintain their existing bank accounts and business forms, (d) implement any changes to the existing cash management system as the Debtors deem necessary or appropriate, including, without limitation, opening new bank accounts or closing existing bank accounts, and (e) continue ordinary course Intercompany Transactions (as defined below); (ii) extending the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code and the operating guidelines established by the Office of the United States Trustee (the "U.S. Trustee") on an interim basis; (iii) scheduling a final hearing to consider entry of the Proposed Final Order, to the extent necessary; and (iv) granting any related relief that is necessary to carry out the foregoing or continued operation of the cash management system, or is otherwise appropriate under the circumstances.

105.    The Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, manage and disburse funds generated and used in their operations.   The Cash Management System comprises twelve bank accounts (collectively, along with any bank accounts the Debtors may open in the ordinary course of business the "Bank Accounts"), maintained at two banks: Fifth Third Bank, National Association and First Bank (collectively, the "Banks").

106.    The Cash Management System is centrally managed by the Debtors out of the Debtors' principal offices in Gardena, California, and all funds in the Bank Accounts are denominated and held in U.S. Dollars.   The Debtors maintain daily oversight of the Cash Management System and implement cash management controls for entering, processing, and releasing funds.   Additionally, the Debtors regularly reconcile books and records to ensure that all transfers are accounted for properly.

<u>The Bank Accounts</u>

107.    The Cash Management System, historically and presently, is operated primarily through six Bank Accounts maintained by the Debtors at Fifth Third Bank.[11]

108.    In April 2020, in connection with applying for a loan (the "<u>PPP Loan</u>") through the Paycheck Protection Program under the CARES Act, the Debtors opened four Bank Accounts at First Bank.[12]   The Debtors received a PPP Loan in the amount of $2.1 million, which was funded into, held, and disbursed through Bank Accounts held at First Bank.  The PPP Loan proceeds have been expended for permitted purposes, the Debtors have applied for forgiveness, and the Debtors are in the process of winding down their relationship with First Bank and migrating any remaining banking activity with First Bank to Fifth Third Bank. Nonetheless, the First Bank accounts must be maintained at this time because certain of the Debtors' customers continue to remit payment to the Debtors' First Bank accounts.

109.    A schedule of the Bank Accounts, including the last four digits of each Bank Account number, the name of the Debtor that holds the account, and the Bank at which the account is held, is attached as Exhibit 1 to each of the proposed orders attached to the Cash Management Motion.  In addition, a table summarizing the nature and purposes of the Bank Accounts may be found in the Cash Management Motion.  I have reviewed that schedule and confirm its accuracy.

<u>Service Charges</u>

110.    In the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow deduction from the appropriate account, certain service charges, fees and other

---

[11]     The Debtors also have two inactive Bank Accounts at Fifth Third Bank.

[12]     The Debtors applied for the PPP Loan through, and opened accounts with, First Bank because it was able to process the Debtors' PPP Loan application more expeditiously than Fifth Third Bank.

costs and expenses associated with maintaining the accounts in accordance with the applicable agreements or schedules of fees governing the Bank Accounts (collectively, the "Service Charges").

111.    The Debtors estimate that there are approximately $10,000 of accrued but unpaid Service Charges outstanding as of the Petition Date, all of which will become due and owing during the Interim Period.  Accordingly, the Debtors request authority, but not direction, to honor and pay prepetition Services Charges in an amount not to exceed $10,000.

### Funds Flow within the Cash Management System

112.    The Cash Management System generally facilitates the following principle cash management functions: (a) cash collection; (b) disbursements to fund the Debtors' operations; and (c) intercompany transfers.  Receipts from operations are deposited into the Depository Account.  The Depository Account is a zero-balance account that is swept daily to the Fifth Third Operating Account.  Funds in the Fifth Third Operating Account are then used by the Debtors to directly or indirectly satisfy various financial obligations arising in the ordinary course of business.  Obligations drawn on the Debtors' disbursement accounts, such as the Cash Disbursement Account and Fifth Third Payroll Account are satisfied through automatic intrabank transfers from the Fifth Third Operating Account.  A cash flow diagram of the Debtors' Bank Accounts is attached to each proposed order attached to the Cash Management Motion.  I have reviewed that diagram and confirm its accuracy.

### Intercompany Transactions

113.    The Debtors engage in limited intercompany transactions in the ordinary course of their business (the "Intercompany Transactions"), primarily to pay director fees for the boards of directors of Debtors Impresa Acquisition Holdings Corporation and Impresa

Acquisition Corporation.  The Debtors maintain records of the Intercompany Transactions, and thus, can ascertain, trace and account for their Intercompany Transactions.  The Debtors reconcile all Intercompany Transactions on a monthly basis.  The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition.

<u>Existing Business Forms</u>

114.    The Debtors use a variety of business forms in the ordinary course of business, including, among others, checks, invoices and letterhead (the "<u>Business Forms</u>").  To minimize expenses and disruption, the Debtors seek authority to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors will communicate with the various vendors and counterparties with whom the Debtors conduct business to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession.  In accordance with Local Rule 2015-2(a), to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the lead case number of these cases.

**H.    Consolidated Lists Motion**

115.    The Debtors have filed a motion (the "<u>Consolidated Lists Motion</u>") seeking entry of an order authorizing the Debtors to: (i) file (a) a consolidated list of creditors and (b) a consolidated list of the Debtors' 30 largest unsecured creditors;[13] (ii) complete all mailings of notices, including notices of the commencement of these cases and of the meeting of

---

[13]    In connection with this request, the Debtors have also requested authority to submit one declaration under Bankruptcy Rule 1008 verifying the validity of the consolidated list of creditors and one declaration verifying the validity of the consolidated list of the Debtors' 30 largest unsecured creditors.

creditors pursuant to section 341 of the Bankruptcy Code; and (iii) redact certain personally identifiable information of the Debtors' current and former employees on the Debtors' consolidated list of creditors and all other filings containing the Debtors' employees' home addresses; and (iv) granting such other and further relief as the Court deems just and proper.

116.    In addition to the reasons set forth in the Consolidated Lists Motion, which I confirm, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, especially considering that the Debtors share creditors.  In addition, I believe that it would not only be prudent but also beneficial to permit the Debtors to redact address information of the Debtors' employees from the creditor matrix because such information could be used to perpetrate identity theft, harassment, or for other unwanted or improper purposes.  The Debtors propose to provide an unredacted version of the consolidated list to the U.S. Trustee, any official committee appointed in these cases, to the Court, and to any other party as the Court may direct.

117.    For the foregoing reasons, I believe granting the Consolidated Lists Motion is in the best interests of the Debtors, their estates and creditors, and parties in interest.

## I.    Cash Collateral Motion

118.    The Debtors have filed a motion (the "<u>Cash Collateral Motion</u>") seeking entry of interim and final orders:

> a) authorizing the Debtors to continue to use Cash Collateral (as defined in the Cash Collateral Order) in which the Prepetition Secured Party (as defined in the Cash Collateral Motion) has an interest in accordance with the terms and conditions of the interim order (the "<u>Cash Collateral Order</u>"), attached to the Cash Collateral Motion as

Exhibit A, and granting adequate protection to the Prepetition Secured Party with respect to, *inter alia*, the use of its Cash Collateral;

b) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein;

c) authorizing the Debtors to continue to honor and perform their obligations under the Receivables Purchase Agreements;

d) scheduling, pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2(c), a final hearing (the "Final Hearing") to be held within thirty-five days of the entry of the Interim Order to consider entry of the Final Order approving the relief granted herein on a final basis;

e) waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order and, as later applicable, the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

f) granting related relief.

119. A summary of the material provisions of the Cash Collateral Order may be found in the Cash Collateral Motion.

120. The Debtors urgently need to use Cash Collateral to continue to operate their business and to fund the administration of these chapter 11 cases. Absent the relief requested in the Cash Collateral Motion, the Debtors will not have sufficient liquidity to continue their business operations, fund payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring. All of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern. Any delay in the Debtors' ability to access Cash Collateral would irreparably harm the Debtors and their estates.

<u>The Debtors' Receivables Purchase Agreements</u>

121. The Debtors also seek authority, but not direction, to continue to maintain and perform under the following Receivables Purchase Agreements (as defined below): (i) the

45

Draft Purchase Agreement dated May 21, 2019, between Impresa Aerospace, LLC, as supplier, and Bank of America, N.A., as bank with Spirit AeroSystems, Inc., as buyer (the "Spirit Receivables Agreement"), (ii) the Supplier Agreement dated October 1, 2019, between Impresa Aerospace, LLC, as supplier and Citibank, N.A., with The Boeing Company as buyer (the "Boeing Receivables Agreement"), and (iii) the Supplier Agreement dated October 1, 2019, between Impresa Aerospace, LLC, as supplier and Citibank, N.A., with Raytheon Technologies Corporation (the "Raytheon Receivables Agreement," and together with the Spirit Receivables Agreement and the Boeing Receivables Agreement, the "Receivables Purchase Agreements").

122.    Under the Receivables Purchase Agreements, the Debtors sell accounts receivables from their customers Spirit AeroSystems, Inc., The Boeing Company, and Raytheon Technologies Corporation (collectively, the "Key Customers") to Bank of America, N.A., and Citibank, N.A. (the "Banks") at a discount to face value.  The Receivables Purchase Agreements help the Debtors manage cash flow and realize revenue earlier than would otherwise occur in the ordinary course of business because the Key Customers have extended payment terms with the Debtors, such that the Debtors typically would not receive payment on receivables from these customers for 60–90 days after a receivable is generated.  The Receivables Purchase Agreements allow the Debtors to receive more immediate payment (albeit at a slight discount to face value), accelerating cash flow and allowing for better cash-flow management.  The Key Customers account for a substantial majority of the Debtors' business.  Thus, without these agreements in place, the Debtors would see an immediate and significant drop in revenue during their chapter 11 cases.  For these reasons, the Debtors believe that continuing to perform under the Receivables Purchase Agreements is critical to the success of their chapter 11 cases.

123.   Accordingly, I believe that granting the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their estates and creditors, and parties in interest, and is essential to avoid immediate and irreparable harm.

**J.     Utilities Motion**

124.   The Debtors have filed a motion (the "Utilities Motion") seeking entry of interim and final orders: (i) prohibiting Utility Providers (as defined below) from altering, refusing, or discontinuing services or discriminating against the Debtors solely on the basis of the commencement of these cases or that the Debtors did not pay a debt when due prepetition; (ii) determining that the Debtors have provided each of the Utility Providers with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code based on the Debtors establishing a segregated account in the amount of $20,250 which is equal to the Debtors' estimate of two weeks of postpetition Utility Services (as defined below) based on the monthly average of all Utility Services; (iii) establishing procedures (the "Additional Assurance Procedures") for determining additional adequate assurance of payment, if any, and authorizing the Debtors to provide additional adequate assurance of payment to the Utility Providers; and (iv) granting related relief.

125.   In the ordinary course of business, the Debtors obtain telephone, internet, gas, electric, water and other utility services (the "Utility Services") from several utility providers (collectively, the "Utility Providers"). The Debtors estimate that, as of the Petition Date, approximately five Utility Providers provide Utility Services to the Debtors. The Utility Services are provided to the Debtors' manufacturing facility and headquarters located in Gardena, California. The Utility Providers include, without limitation, the entities identified on the list attached to the Utilities Motion as Exhibit C (the "Utility Providers List").

126.    The Debtors cannot operate their business and serve their customers without Utility Services.  Even a temporary interruption of such services would cause significant disruption to the Debtors' day-to-day operations that could impair the Debtors' goodwill and other assets, and thereby negatively impact the Debtors' efforts to maximize the value of their estates.  Accordingly, it is critical that the Debtors have uninterrupted Utility Services.

127.    In general, the Debtors have established a good payment history with their Utility Providers, making regular, timely payments.  Over the past year, the Debtors have paid an average of approximately $40,500 per month on account of all Utility Services.  To the best of the Debtors' knowledge, there are generally no material defaults or arrearages with respect to undisputed invoices for the Utility Services provided at the Debtors' manufacturing facility as of the Petition Date.

<u>Proposed Adequate Assurance</u>

128.    The Debtors propose to deposit, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.*, approximately $20,250) (the "<u>Adequate Assurance Deposit</u>"), calculated based on the historical data for the past year, into one segregated bank account (the "<u>Utility Deposit Account</u>") designated for the Adequate Assurance Deposit for the benefit of all Utility Providers.  Thereafter, the Debtors propose to adjust the amount in the Utility Deposit Account as follows: (i) reducing the amount held in the Utility Deposit Account to account for the payment and termination of Utility Services by the Debtors for any given account; (ii) modifying the amount held in the Utility Deposit Account on the basis of agreements reached with Utility Providers regarding Additional Assurance Requests, including, to the extent any Utility Provider receives any other value from the Debtors as adequate assurance of payment, reducing the Adequate Assurance Deposit

maintained in the Utility Deposit Account on account of such Utility Provider by the amount of such other value; and (iii) adding additional amounts in the event that the Debtors amend the Utility Providers List to add one or more additional Utility Providers. These adjustments will permit the Debtors to maintain the Utility Deposit Account with an amount that consistently provides the Utility Providers with a two-week deposit on account of such services.

129. If any Utility Provider believes additional assurance ("Additional Assurance") is required, the Debtors propose that such Utility Provider be required to request such Additional Assurance by following the Additional Assurance Procedures described in the Utilities Motion.

130. The Additional Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to administer their chapter 11 estates without undue distraction or interruption. Absent compliance with the Additional Assurance Procedures, the Debtors are requesting that the Utility Providers, including Utility Providers that begin providing services to the Debtors during the pendency of these cases, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.

131. I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for postpetition utility services in the ordinary course of business through revenue generated in operations and access to cash collateral (together, the "Proposed Adequate Assurance"), constitutes adequate assurance to the Utility Providers to satisfy the requirements of section 366 of the Bankruptcy Code. Further, I believe the Adequate Assurance Procedures are reasonable under the circumstances.

132.    For the foregoing reasons, I believe granting the Utilities Motion is in the

best interests of the Debtors, their estates and creditors, and parties in interest.


Dated: September 24, 2020
Wilmington, DE                          /s/ Steven F. Loye
                                        Steven F. Loye
                                        Chief Executive Officer
                                        Impresa Holdings Acquisition Corporation, et al.